1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

        Plaintiff,

    v.

MICHELLE MAZZETTI,

        Defendant.

_____/

CASE NO.   6:11-mj-00090-MJS-1

ORDER

I.   **INTRODUCTION**

      Defendant and seven of her friends were camping in North Pines Campsite in Yosemite National Park on July 26, 2011. While Defendant was walking to the group's campsite, other members of the group were reported to be driving too fast and acting disorderly in the campground.  Park rangers came to the site to investigate.  On arrival the rangers detained the entire group, including Defendant.  Defendant was perceived by a ranger to fail to comply with his orders pursuant to the investigatory stop.  The ranger attempted physically to restrain her and then produced and threatened to use his Taser electroshock weapon on her. Defendant subsequently was arrested for this conduct.  She

-1-

reacted to the ranger's search incident to arrest by screaming loudly and moving her body in ways which interfered with the ranger's search.

As discussed in detail below, these events give rise to significant First and Fourth amendment issues regarding the rangers' right to conduct an investigatory stop or otherwise order Defendant to refrain from movement, the right of Defendant to verbally criticize the conduct of the Rangers, and the right of Defendant reasonably to resist an unlawful arrest. Those matters are analyzed in some depth below.[1]

## II.   RELEVANT FACTS

The following summary of relevant facts is taken from the criminal Complaint on file and testimony and exhibits provided at trial:[2]

On July 26, 2011, Yosemite National Park Law Enforcement Rangers Chris Bellino and David Sanchez were dispatched to the North Pines Campground in Yosemite Valley to investigate a complaint of a group of people behaving in a disorderly fashion.  At the campground Ranger Bellino met with at least one Yosemite desk officer and a camper who reported that a group of campers had been driving around the campground at unspecified "high speeds" in a Jeep Liberty with one member of the group riding on the outside back

---

[1] Not surprisingly, these issues have necessitated a particularly complicated, arduous and lengthy analysis of applicable law, notwithstanding that the originating offenses were quite minor.  This is not to denigrate the issues nor suggest they are unworthy of such analysis.  This Court has observed that even Class B misdemeanors can, and often do, raise precisely the same constitutional challenges as those generated by much more serious crimes resolved in higher courts.  Still, this Court cannot but rue the fact that all that has gone before in this case and all that follows below could so easily have been avoided had the various parties involved exercised a bit more judgment and restraint.

[2] The only evidence provided in addition to the trial testimony was video from the rangers' shoulder mounted video cameras. (See Trial Exs. A, I, and II.) The videos are not at all times clear; one of the video cameras was angled in an upward direction so that some actions of the parties could not be determined. Nevertheless, examination of the audio and video portions obtained from two rangers' cameras produces a generally comprehensive and accurate account of the events and the demeanor of the those involved.

of the vehicle.[3] (RT 7-8.[4]) The desk officer and witness reported that the individuals in the Jeep were yelling profanities at a slower moving vehicle in front of it.[5] (RT 25.)

At trial, Ranger Bellino had only limited recall of what was said about actions of individual members of the group. He could not remember if he was told whether either the driver or the individual riding on the back was male or female. (RT at 26.) He did not know how many people were in the vehicle, but he recalled being told that all of the people in group, male and female, had been disorderly and shouted profanities. (Id.) He acknowledged that as he approached the campsite, he had no information beyond the statements from the desk officer and had no reason to suspect Defendant had a criminal history or was armed or dangerous. (RT at 32.) He noted, though, that in his experience disorderly groups were more of a threat to ranger safety than orderly ones. This group was not, however, acting disorderly when he arrived. (Id. at 42.)

The desk officer had identified the group and vehicle as those at campsite number 308. (RT 7-8.) When Rangers Bellino and Sanchez arrived, they observed a group of eight people, including Defendant Michelle Mazzetti, at the campsite. At the time, members of the group were on foot and dispersed throughout the site. (Id. at 8.) None was driving a vehicle. Apparently, no member of the group was then engaged in the violation of any law.

---

[3] A Desk Officer is a volunteer working for the Park Service who resides in the campground during the summer season and assists Park Service employees with day-to-day management of the campground. Reportedly, desk officers are oftentimes retired law enforcement officers.

[4] The Court shall refer to the reporter's transcript of the trial as "RT."

[5] At trial, Ranger Bellino had difficulty in recalling and describing the exchange with the desk officers. He first testified that he spoke to several of the desk officers and another witness upon arriving at the campground. (RT 7-8.) On cross-examination he admitted he could not recall how many desk officers he met on arrival and that while he knew he had talked to at least one, he was not certain which one it was. (Id. at 23-24.)

1  Ranger Bellino did not observe anyone conducting his or herself in a disorderly fashion as

2  he arrived at the campsite. (Id. at 28.)  There is nothing about the appearance of the group

3  in the video to suggest to the Court that they were anything but a normal group of

4  compliant young adults in their mid-twenties on a camping trip.

5

6         Ranger Bellino entered the campsite and directed the members of the group to sit

7  at a single picnic table and keep their hands visible. The group members complied.

8  Ranger Bellino asked if any one in the group had a weapon. The group responded in the

9  negative. He questioned them regarding the complained-of behavior. Other than what

10 ensued between Ranger Bellino and Defendant, the next fifteen minute exchange

11 produced little more than ongoing denials of any wrongdoing on the part of the group

12 members.[6] Though not perfectly clear from the video, Defendant reportedly had to be

13 reminded to keep her hands visible. (She testified she had a nervous habit of putting her

14 hands in her pants pockets which in this case were primarily decorative and

15 accommodated little more than the tips of her fingers.)

16

17        Within two minutes of the rangers' arrival, the driver of the Jeep Liberty identified

18 himself and acknowledged exchanging words with two older men who had asked where

19 he and his friends were going. The driver explained that in an attempt to find the campsite,

20 they had circled the campground, but at no time driven at a speed greater than eight miles

21 per hour. The driver denied knowledge of anyone riding on the back of the vehicle; his

22 visibility was blocked by people and equipment in the vehicle.  Others in the group

23 indicated that they were driving in a separate vehicle. While the driver was describing the

24

25

26        [6]The videos do reveal that after the confrontation between Ranger Bellino and Defendant,
27 described below, members of the group began using unnecessary and offensive profanities.  Prior to that
    point, they appeared calm and refrained from offensive language.

events, Defendant advised Ranger Bellino that she had walked into the campsite and was not in or on the vehicle. Nothing appears to have contradicted that statement. Thus, as the questioning began, there was nothing to indicate that Defendant had engaged in any unlawful behavior of any kind.

At about two and one half minutes into the discussion, Defendant, who had been leaning against the crowded picnic table, stood (because, she testified at trial, she was uncomfortable and her circulation was being cut off by the edge of the table). She then walked approximately five feet to a nearby tree and kneeled down. She complained that there was no place for her to sit at the table and that she was not, in any event, involved in the matter. Ranger Bellino repeatedly told her to sit down.  He advised: "There's a lot of you here. I'm going to put you in handcuffs if you don't do what I say." Defendant declined a direction to sit on the ground. She then sat in a camp chair provided for her. Ranger Sanchez told her to sit in the chair and not to get up.

The Rangers continued their questioning of the group collectively. At about four minutes into the conversation, Defendant asked Ranger Bellino what was going to happen and if he was going to issue a ticket. Ranger Bellino replied that he might issue a ticket. Defendant stated that he could not issue her a ticket.  Bellino stated he could issue her a ticket for not doing what he told her to do. She responded that she was doing what she was ordered to do.  The driver also attempted to point out to the Rangers that Defendant had walked to the campsite from some three miles away.

Once directed to the chair, Defendant appears to sit there, compliant and calmly conversing  with the rangers for about two more minutes at which time Ranger Bellino told the group he "needed identification."  Reportedly because they had  been swimming, some

in the group, including Defendant, did not have identification in their clothing. Defendant got up to retrieve her drivers' license. This action precipitated a *very* brief episode in which Defendant stood up and, in response to Ranger Bellino's protest, stated she was going to get her identification. Ranger Bellino seemed somewhat taken aback by this reaction.  He twice ordered Defendant to sit down and then attempted, unsuccessfully, to restrain her physically; she backed away from his grasp.

No more than five seconds passed between Ranger Bellino's request for identification and his reaching out in an unsuccessful attempt to restrain Defendant. During that time, Defendant pointed out more than once that it was the Ranger who had asked for her identification.  As Defendant pulled away, Ranger Bellino unholstered his Taser and aimed it at Defendant, whereupon she, encouraged by the group to do so, resumed sitting quietly. (It appears she continued to remain sitting quietly until later directed by Ranger Bellino to get up and accompany him.)  One of the male members of the group, who had remained seated throughout the incident,  asked Ranger Bellino "Are you really going to Taser a girl, officer?" Ranger Bellino responded, "I am. I will Taser you too."

After the above-described incident, Ranger Bellino radioed for backup.  He continued to instruct Defendant on the need for her to do what he told her to do. Defendant, in effect, complained about the difficulty complying when the ranger gave conflicting instructions.  After placing the call for back-up, Ranger Bellino ordered Defendant, still seated in the chair, to get on her knees. Defendant refused. She pointed out that she was sitting down peacefully. Ranger Bellino pointed out her earlier failure to sit down as ordered.  Defendant countered that she had simply gotten up to get her

identification as ordered.

Ranger Bellino explained further: "When people don't do what I say, I consider it a threat.  Whether you guys think she's a threat or not, I think she is a threat." and "When I tell you to sit down ma'am, you need to stay seated. People who do not do what we tell them to do get arrested and go to jail. Okay. Whether you did anything wrong before that or not doesn't matter. I need to be able to control everyone here because there's eight of you and I don't know you. You understand?"

Another otherwise uneventful ten minutes or so passed with Ranger Bellino continuing his inquiry and awaiting the arrival of additional rangers. He did explain to the group that "officer safety" concerns dictated that all members of the group obey his commands; he could not allow even one to disobey because that might mean he would end up having to fight the entire group of eight.

When additional rangers arrived, Ranger Bellino recounted the history of events to one of them and advised he did not intend to cite any of the group other than Defendant. He also indicated he was disinclined to arrest Defendant. Following a comment from the other ranger, Ranger Bellino changed his mind and decided to arrest Defendant for interfering with law enforcement.

He thereupon had Defendant stand and walk a short distance from the group where he placed her in handcuffs.  There is dispute between the two as to whether and how much she cooperated or resisted in being handcuffed, but other than her proclaiming the unfairness of the situation, the handcuffing appears in the video to have been relatively uneventful.

Ranger Bellino and another ranger then escorted Defendant further away from the

-7-

campsite and had her stand facing the side of a Ranger vehicle as Bellino began to search her. Other than Defendant expressing verbal protests and seeming to twist her head while her hair was being searched, the search was uneventful until Ranger Bellino announced that, there being no female ranger on duty, he was going to search Defendant's breasts and groin. Defendant reacted with what can only be described as hysterical, *extremely* loud screaming and twisting of her body, while standing and then on the ground, to avoid Ranger Bellino's hands. During the search, Defendant continuously screamed very loudly for help and demanded that the rangers stop touching her breasts and groin. Ranger Bellino testified that during the search, Defendant kicked him in the leg and continued to kick at the rangers while on the ground. The search concluded with Defendant face down on the ground and a ranger's knee in her back. No contraband or weapon was found. Defendant, still handcuffed behind her back, was placed in a law enforcement vehicle. Her exceedingly loud, continuous screaming continued for the several additional minutes the vehicle remained near the scene. Reportedly, it continued as she was transported to the holding facility. At some point during transit, Defendant wrestled her handcuffed hands from the back of her body to the front.

## III.   THE CHARGES

The above events led to the filing of a Criminal Complaint charging Defendant with four Class B misdemeanor counts: (1) Interfering with a government officer engaged in official duty in violation of 36 C.F.R. 2.32(a)(1); (2) Violating a lawful order in violation of subsection (a)(2) of the same regulation; (3) Acting to incite a breach of the peace in violation of 36 C.F.R. 2.34(a)(2); and, (4) Making unreasonable noise in violation of subsection (a)(3) of the same regulation.

-8-

Defendant pled "not guilty" to all charges..

## IV.   TRIAL

On February 16, 2012, the matter came to trial before the undersigned Magistrate Judge in the United States District Court for the Eastern District of California, Yosemite Division. The United States was represented by Legal Officers Susan St. Vincent and attorney Rachel Cartier. Defendant was represented by attorney Carol Moses. Testimony was heard and documentary evidence admitted. Defendant's motion for judgment at the close of the government's case was submitted.  An opposition brief has been filed by the government and a reply filed by the Defendant. The case has been submitted.

## V.   APPLICABLE LAW

### A.   What Constitutes a Stop or Arrest?

An initial issue here is that of whether Defendant was 'seized' or otherwise detained under the Fourth Amendment when Ranger Bellino ordered her to sit and remain at the campground table. "[N]ot all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." United States v. Mendenhall, 446 U.S. 544, 552 (U.S. 1980) (citing Terry v. Ohio, 392 U.S. 1, at 19, n. 16 (1968)). The Supreme Court has held that:

> [A] person is "seized" only when, by means of physical force or a show of authority, his freedom of movement is restrained. Only when such restraint is imposed is there any foundation whatever for invoking constitutional safeguards. The purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals. As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would

under the Constitution require some particularized and objective justification. Mendenhall, 446 U.S. at 553-554.

Alternatively stated, "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave" or "not at liberty to ignore the police presence and go about his business." Mendenhall, 446 U.S. at 554; Florida v. Bostick, 501 U.S. 429, 437 (1991). Further, the seizure must be intentionally made on behalf of law enforcement. Brower v. County of Inyo, 489 U.S. 593, 597 (1989) (requiring a governmental termination of freedom of movement through means intentionally applied.); United States v. Al Nasser, 555 F.3d 722, 728-29 (9th Cir. 2009).

**B.    Authority for Terry Stop to Investigate Past Criminal Conduct**

The Fourth Amendment prohibits "unreasonable searches and seizures" and its protections extend to brief investigatory stops of persons that fall short of traditional arrest. United States v. Arvizu, 534 U.S. 266, 273 (2002); Terry v. Ohio, 392 U.S. at 9.

In order to initiate an investigatory stop, "the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity may be afoot. United States v. Arvizu, 534 U.S. at 273 (citing United States v. Sokolow, 490 U.S. 1, 7 (1989); see also United States v. Cortez, 449 U.S. 411, 417 (1981) ("An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity"). "Although an officer's reliance on a mere 'hunch' is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." Arvizu, 534 U.S. at 273-274 (citations omitted.)

-10-

In determining if there is reasonable articulable suspicion to stop a person, law enforcement must examine the totality of the circumstances:

> Courts have used a variety of terms to capture the elusive concept of what cause is sufficient to authorize police to stop a person. Terms like 'articulable reasons' and 'founded suspicion' are not self-defining; they fall short of providing clear guidance dispositive of the myriad factual situations that arise. But the essence of all that has been written is that the totality of the circumstances -- the whole picture -- must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.

United States v. Cortez, 449 U.S. at 417-418.

From the totality of the circumstances, the law enforcement officer "draws inferences and makes deductions -- inferences and deductions that might well elude an untrained person." Id. at 418. Furthermore, the evidence must create particularized suspicions "that the particular individual being stopped is engaged in wrongdoing." Id.; see also Ybarra v. Illinois, 444 U.S. 85, 93-94 (1979) ("The 'narrow scope' of the Terry exception does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked.").

In this case, the Ranger approached Defendant during investigation of an already completed crime. In such cases, the Supreme Court has held that the same framework for the proper bounds of intrusions regarding investigations of imminent or ongoing crimes applies, but "[t]he precise limits on investigatory stops to investigate past criminal activity are more difficult to define." United States v. Hensley, 469 U.S. 221, 228 (1985).

The Supreme Court explained that the investigation of already completed crimes may have a lesser impact on the interests of crime prevention, detection, and public safety:

> The factors in the balance may be somewhat different when a stop to investigate past criminal activity is involved rather than a stop to investigate

ongoing criminal conduct. This is because the governmental interests and the nature of the intrusions involved in the two situations may differ. As we noted in <u>Terry</u>, one general interest present in the context of ongoing or imminent criminal activity is "that of effective crime prevention and detection." <u>Terry</u>, 392 U.S., at 22. A stop to investigate an already completed crime does not necessarily promote the interest of crime prevention as directly as a stop to investigate suspected ongoing criminal activity. Similarly, the exigent circumstances which require a police officer to step in before a crime is committed or completed are not necessarily as pressing long afterwards. Public safety may be less threatened by a suspect in a past crime who now appears to be going about his lawful business than it is by a suspect who is currently in the process of violating the law. Finally, officers making a stop to investigate past crimes may have a wider range of opportunity to choose the time and circumstances of the stop.

<u>United States v. Hensley</u>, 469 U.S. at 228-229.

Accordingly, "if police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a <u>Terry</u> stop may be made to investigate that suspicion." <u>Id.</u> at 229.

**C.    Investigatory Stops for Completed Misdemeanors**

"[I]n the context of felonies or crimes involving a threat to public safety, it is in the public interest that the crime be solved and the suspect detained as promptly as possible. The law enforcement interests at stake in these circumstances outweigh the individual's interest to be free of a stop and detention that is no more extensive than permissible in the investigation of imminent or ongoing crimes." <u>United States v. Hensley</u>, 469 U.S. at 229. However, the Supreme Court has not addressed whether the same interests allow for <u>Terry</u> searches of lesser offenses. <u>Id.</u> ("We need not and do not decide today whether <u>Terry</u> stops to investigate all past crimes, however serious, are permitted.").

The Ninth Circuit, in <u>United States v. Grigg</u>, 498 F.3d 1070 (9th Cir. 2007), addressed the issue of investigative stops as applied to completed misdemeanors.  The

court "decline[d] to adopt a per se standard that police may not conduct a <u>Terry</u> stop to investigate a person in connection with a past completed misdemeanor simply because of the formal classification of the offense." <u>Id.</u> at 1081. However, the "evaluation of a <u>Terry</u> stop in the context of a completed misdemeanor should tend to give primary weight to a suspect's interests in personal security, while considering the law enforcement's interest in the immediate detention of a suspect is not paramount." <u>United States v. Grigg</u>, 498 F.3d at 1080. The Ninth Circuit also found that the nature of the misdemeanor was a significant factor. "Circumstances may arise where the police have reasonable suspicion to believe that a person is wanted in connection with a past misdemeanor that the police may reasonably consider to be a threat to public safety." <u>Id.</u> at 1081. More specifically, the Ninth Circuit:

> [A]dopt[ed] the rule that a reviewing court must consider the nature of the misdemeanor offense in question, with particular attention to the potential for ongoing or repeated danger (e.g., drunken and/or reckless driving), and any risk of escalation (e.g., disorderly conduct, assault, domestic violence). An assessment of the "public safety" factor should be considered within the totality of the circumstances, when balancing the privacy interests at stake against the efficacy of a <u>Terry</u> stop, along with the possibility that the police may have alternative means to identify the suspect or achieve the investigative purpose of the stop.

<u>United States v. Grigg</u>, 498 F.3d at 1081.

In identifying specific categories of offenses that may evidence ongoing or repeated danger, the Ninth Circuit relied upon examples from state court opinions finding investigatory stops reasonable. In <u>State v. Myers</u>, 490 So. 2d 700, 701 (La.App. 2 Cir. 1986) the Louisiana Appeals Court found a stop of driver of a vehicle that had struck a vehicle sign prior to entering the state was reasonable in part due to the danger to public safety of a potentially impaired or inattentive driver on the road. In <u>City of Devils Lake v.</u>

Lawrence, 639 N.W.2d 466, 467 (N.D. 2002), the North Dakota Supreme Court found reasonable a stop related to a call of threatening behavior and fear that a fight was about to begin. Finally, in State v. Burgess, 776 A.2d 1223, 1228 (Me. 2001), the Supreme Judicial Court of Maine found a stop reasonable based a tip that the suspect had been driving intoxicated and had threatened to shoot another vehicle.

The Ninth Circuit found the stop of Grigg, unlike those in the above cases, unreasonable as it was based on a noise infraction that did not generate concern for public safety. United States v. Grigg, 498 F.3d at 1083.

The Ninth Circuit noted that all but two states in the circuit had passed legislation prohibiting law enforcement officers from arresting someone for a misdemeanor committed outside of his or her presence. Id. at 1080 n.7. In an attempt to apply the rule of United States v. Hensley to the case of completed misdemeanors, the Ninth Circuit reasoned that Hensley allowed a court to "properly consider the gravity of the offense in balancing the interest of crime prevention and investigation against the interest in privacy and personal security when a court assesses the reasonableness of a Terry stop." United States v. Grigg, 498 F.3d at 1077. Ninth Circuit arrived at the following rule with regard to analyzing investigatory stops, including stops involving misdemeanors:

> [A] court reviewing the reasonableness of an investigative stop must consider the nature of the offense, with particular attention to any inherent threat to public safety associated with the suspected past violation. A practical concern that increases the law enforcement interest under Hensley is that an investigating officer might eliminate any ongoing risk that an offending party might repeat the completed misdemeanor or that an officer might stem the potential for escalating violence arising from such conduct, both of which enhance public safety. Conversely, the absence of a public safety risk reasonably inferred from an innocuous past misdemeanor
>
> suggests the primacy of a suspect's Fourth Amendment interest in personal security. Grigg, 498 F.3d at 1080.

## VI.   ANALYSIS

### A.   Was Defendant Seized Under the Fourth Amendment?

Defendant's liberty and freedom of movement were without doubt substantially constrained. Upon approaching Defendant's group, the rangers repeatedly ordered the group to sit at the table and show their hands. When Defendant first stood and undertook to move away from the table, she was directed to sit down. She was told that if she did not comply with the rangers' orders, she would be handcuffed.

No reasonable individual, given repeated orders from law enforcement to refrain from physical movement and threatened with being handcuffed for non-compliance, would believe she was free to leave or ignore the police and go about her business. See Mendenhall, 446 U.S. at 554. The Supreme Court has stated that "As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy . . . " Id. Here, Defendant attempted to do just that; she attempted to extricate herself from the questioning, and was ordered, with threat of being handcuffed, not to leave. Defendant's freedom of movement was effectively restrained by the rangers.

Defendant was "seized" by the actions of the rangers.  Constitutional safeguards provided by the Fourth Amendment were triggered.

### B.   Sufficiency of the Reasonable Suspicion to Conduct the Stop

#### 1.   Particularized Suspicion as to Defendant

The Court must now determine if there was reasonable suspicion for the rangers to have so constrained Defendant's liberty and freedom of movement during their investigation of alleged criminal activity, i.e., to have conducted the Terry stop.

-15-

The Supreme Court has explained that the evidence must create particularized suspicions that the particular individual being stopped is engaged in wrongdoing. United States v. Cortez, 449 U.S. at 417-418.  Ranger Bellino stopped an entire group of eight people.  He had received a report of a group of individuals in a vehicle engaged in possible misdemeanor behavior.  He was told that the vehicle was associated with the campers in site 308. Multiple vehicles were visibly present at the campsite. There were eight individuals at the campsite. There does not appear to have been any reason to believe all eight individuals had been in the vehicle.

Other than having been given the number of the campsite where the individuals in question were believed to be located, Ranger Bellino was provided no information about the people in the vehicle, their number or their descriptions.  He was told only that the vehicle was "filled" with people. (RT 26.) His questioning of the group made it clear he did not know who had been driving the vehicle or who had allegedly been riding on the back of it. He could not recall if had any information as to the sex of either. (RT 26.)  He did know that some females were involved. Id.

In short, his "particularized description" of the reported misdemeanants was that they were some individuals at the campsite.  That suspicion alone was insufficient to justify the Terry stop of Defendant.

> 2. Violation of Speed Laws

One of the criminal activities reported was that the vehicle was being driven fast through the campground.[7] Ranger Bellino testified he did not believe such an act would

---

[7] At trial, there was uncertainty as to whether the speed limit in the campground was five or ten miles an hour. Those reporting the incident to the rangers had not provided any estimate of the speed the vehicle had been traveling.

-16-

amount to more than a misdemeanor. The act had taken place out of his presence; it was not ongoing. Accordingly, the investigation of the activity "should tend to give primary weight to a suspect's interests in personal security, while considering  the law enforcement's interest in the immediate detention of a suspect is not paramount." United States v. Grigg, 498 F.3d at 1080.

Ranger Bellino  was required to consider the totality of the circumstances, including the nature of the misdemeanor offense in question and give particular attention to the potential for ongoing or repeated danger to the public safety and risk, if any, of escalation. Grigg, 498 F.3d at 1081. Such an analysis includes the consideration of whether "the police may have alternative means to identify the suspect or achieve the investigative purpose of the stop." Id.

Certainly, as he undertook to respond to the report, Ranger Bellino could have had concern that someone might be injured if a vehicle was being driven at an exceedingly fast speed. However, he had no information as to what was meant by "fast" nor any reason to believe the speed threatened public safety. (From the information he had, the "speeding" vehicle may have been driving seven miles per hour in a five mile zone or twelve miles in a ten mile zone. Such speeds would not necessarily pose a risk to the public.) More importantly, when he arrived, the vehicle was parked and the members of the group were on foot in the campsite. No suspect vehicle was being driven fast or at all.  Ranger Bellino saw no ongoing disorderly conduct.  Thus, even if there had been a threat to public safety, it clearly had subsided by the time Ranger Bellino arrived at the campsite. This is a significantly different situation from those the Ninth Circuit in Grigg found to be of significance.  Here there was no potentially impaired or inattentive driver still on the road

as in <u>State v. Myers</u>, 490 So. 2d 700, 701 (La.App. 2 Cir. 1986). There was no report of an intoxicated driver who had threatened to shoot another vehicle as in <u>State v. Burgess</u>, 776 A.2d 1223, 1228 (Me. 2001).

A report that one of a group of individuals in a vehicle had been driving "fast" does not, alone, raise a sufficient concern for public safety as to allow an investigatory stop of eight individuals after the act had been completed.

### 3.   Person on the Outside of the Vehicle

The report also indicated that a person was riding on the outside of the vehicle as it was being driven around the campsite. Although this was not at any time identified as a criminal act, it may well have constituted a violation of vehicle safety regulation under applicable federal regulations or the California Vehicle Code.[8] Even so, it alone would not have suggested a significant risk to the safety of anyone and of course it had ended before Ranger Bellino approached the campsite. Additionally, there was no particularized identification of the individual on the back of the vehicle, even by sex, beyond reference to a member of the group at the campsite. This reported activity alone would not have justified the investigatory stop of Defendant.

### 4.   Profanities

The rangers had been told that individuals in the vehicle had yelled profanities at other campers and possibly at the desk officers. Such conduct could be associated with disorderly conduct, but, as discussed below, is not in and of itself necessarily disorderly conduct.

---

[8] The Assimilative Crimes Act incorporates state criminal offenses as offenses punishable under federal law and thereby capable of prosecution by the federal government. 18 U.S.C. § 13(a).

1
2
3
4
5
6
7

One could reasonably be concerned with the potential that exchanges of obscenities might escalate to physical altercation, but here there were no facts to suggest that physical violence was threatened in any way or that public safety was at risk, and, again, no such risk was presented when Ranger Bellino arrived.  He saw no disorderly behavior from the group. (RT 28.)  Clearly, there was no ongoing public safety or escalation risk when Bellino arrived.  Again, there was no justification here for an investigatory stop of Defendant.

8

4.     Conclusion

9
10
11
12
13
14
15
16
17

The evidence makes clear that arriving Rangers had no particularized articulable suspicion that Defendant had engaged in any criminal conduct.  Even if the contrary had been true, the alleged criminal conduct was, at worst, a misdemeanor and unaccompanied by reported threat to public safety. Significantly, the complained-of conduct had ceased. Despite recognizing law enforcement's ability to draw upon inferences and make deductions that might elude untrained people (see Cortez, 449 U.S. at 417-418), the Court can identify absolutely nothing happening at this campsite that sufficed to raise a concern justifying an infringement on Defendant's Fourth Amendment rights.

18
19
20
21
22
23
24
25
26

Based on the record before the Court, including the primary concern for the personal freedom of individuals who are suspected of having done nothing more than to have committed, and completed, a misdemeanor, the rangers had the right and duty to approach the group and question its individual members regarding possible criminal activity. However, they  lacked the right to conduct an investigatory stop, i.e, restrain the liberty, of Defendant. They did restrain her. The restraints violated protections afforded her under the Fourth Amendment to the United States Constitution.

27

The Court does not discount nor denigrate the reasonableness and sincerity of

Ranger Bellino's belief that the restraints on Defendant's freedom were necessary to ensure safety of himself and his fellow rangers dealing with members of a group which outnumbered the Rangers. The Court respects such concerns. History has shown that law enforcement personnel are regularly exposed to wholly unexpected, and all too often deadly, threats. However, our Constitution demands that such concerns be balanced against citizens' rights to be free of unreasonable seizure of their persons. Thus, law enforcement may not take action to restrain the personal liberties of individuals based on purely theoretical safety concerns. Here, when Ranger Bellino arrived, nothing suggested to him that any member of the group had engaged in any serious crime or threat to public safety or posed an ongoing threat to Ranger Bellino or anyone else. There was no justification for using the threat of force to compel Defendant's continued presence.

### C.    Interfering With Agency Functions

#### 1.    Failure to Obey a Lawful Order

Defendant was charged with violating two separate subsections of 36 C.F.R. § 2.32, "Interfering with agency functions," by twice violating lawful orders during the investigative stop: first, when she stood and walked a short distance from the picnic table despite being ordered to remain seated (Gov't Post Trial Bf. at 9, ECF No. 20.); and second, when she stood and began walking to retrieve her identification. (Id.)[9]

The relevant regulatory subsection reads:

(2) Lawful order. Violating the lawful order of a government employee or agent authorized to maintain order and control public access and movement

---

[9] Ranger Bellino also testified that Defendant put her hands in her pockets after having been ordered to keep them visible. (RT 9.) Because the Government briefs do not argue that such action constituted a basis for prosecution, the Court will not address it as such. However, had it done so, there is no reason that the analysis and disposition of such a charge would be any different than that discussed in this section.

during fire fighting operations, search and rescue operations, wildlife management operations involving animals that pose a threat to public safety, law enforcement actions, and emergency operations that involve a threat to public safety or park resources, or other activities where the control of public movement and activities is necessary to maintain order and public safety.

To constitute a violation, the disobeyed order must have been a lawful one. Here, the lack of particularized suspicion of Defendant, the minor nature of the offenses being investigated, and the absence of any ongoing threat to the public rendered this Terry stop unwarranted. This Court's reading of applicable law precludes the bootstrapping of an investigatory stop which violates the Fourth Amendment into a regulatory violation based on disobeyance of an order issued in the course thereof.

Brown v. Texas brought before the Supreme Court a Texas law under which Brown had been ordered to identify himself and provide his address even though police had no reason to suspect that Brown was armed or had engaged in criminal activity. 443 U.S. 47 (1979). After being stopped by police, Brown refused to identify himself. Id. at 48-49. He was arrested and then convicted of violating a state statute requiring identification. Id. The Supreme Court reversed the conviction. It found that the detention of Brown for the purpose of identifying him was a seizure under the Fourth Amendment without any reasonable suspicion that Brown had engaged in criminal activity and hence was an unauthorized Terry investigatory stop. Id. at 51-52. Even though the statute may have been "designed to advance a weighty social objective" of preventing crime, "the guarantees of the Fourth Amendment do not allow it." Id. at 52. "When such a stop is not based on objective criteria, the risk of arbitrary and abusive police practices exceeds tolerable limits." Id. Application of the Texas statute to allow the officers to detain Brown and require him to identify himself without reasonable suspicion of criminal conduct violated the Fourth

Amendment; Brown's conviction was reversed. Id.

Similarly here, Defendant cannot be found guilty of failing to obey orders given pursuant to an unlawful restraint of Defendant's liberty under the Fourth Amendment. The application of 36 C.F.R. § 2.32(a)(2) effectuating the improper seizure of Defendant's person violated the Fourth Amendment. Such application was unlawful. The regulation necessarily presupposes a lawful order. There was no such order here. Defendant cannot be found guilty of violating a lawful order. The charges for violating this regulation are dismissed.[10]

### 2.   Interference with Investigatory Stop

Defendant was also charged with resisting or interfering with the performance of the official duty of a government agent. 36 C.F.R. § 2.32(a)(1). That subsection reads:

> (1) Interference. Threatening, resisting, intimidating, or intentionally interfering with a government employee or agent engaged in an official duty, or on account of the performance of an official duty.

For the same reasons noted above, Defendant cannot be found guilty of resisting or interfering with an unlawful investigative stop. Without proper justification, the rangers could not lawfully order Defendant to refrain from movement and her failure to do so cannot be said to violate a lawful order.

The Court does note that at least one federal circuit has found that "a defendant's response to even an invalid . . . Terry stop may constitute independent grounds to arrest." United States v. Dawdy, 46 F.3d 1427, 1431 (8th Cir. 1995). However, a dissent by Judge

---

[10] The same logic and analysis applies to the confrontation that arose in response to Defendant's standing and walking to retrieve her identification.  Additionally though, in this latter instance, the Court would be unable to conclude, beyond a reasonable doubt, that Defendant had the mental state necessary to effect a violation of a direct order.  From the evidence presented, the Court cannot discredit her claim that she  believed she was obeying an order to retrieve identification located outside of her immediate presence.

Lay strongly criticized the new law created by the majority:

> Under the majority's analysis, every illegal seizure can now be considered attenuated from an ensuing illegal search if the arrestee even flinches or makes a perky movement of hesitation or resistance to his illegal seizure. This reduces the <u>Terry</u> doctrine and the Fourth Amendment to a meaningless shamble. It is difficult for me to understand why it is necessary for courts to stretch the rules governing arrests to the ends of legal credulity to circumvent constitutional principles.

<u>Dawdy</u>, 46 F.3d at 1437 (Lay, J., dissenting.). Neither the Supreme Court nor the Ninth Circuit has held similarly, and this Court is unwilling to do so without being  directed by controlling authority, particularly here where Defendant, though acting to avoid being handcuffed,  did not threaten to strike the rangers. Such  minimal resistance to an unlawful seizure is not criminal. Charges that Defendant interfered with the rangers in their official duty are dismissed.

### D.   Disorderly Conduct

#### 1.   <u>Language As Incitement or Breach of the Peace</u>

Defendant was charged with disorderly conduct for yelling during the search incident to arrest. Specifically, on being told that no female officers were then available and that Ranger Bellino would conduct the search of Defendant's breasts and pelvic area, Defendant began screaming loudly (an understatement), sometimes using profanities,  in protest, and demanding that Bellino stop.

The Government argues that Defendant's screams 'incited' the public because other campers "gathered[,] clearly disturbed and concerned by the scene." creating a potentially dangerous risk that other campers would  attack the rangers.  (Gov't Post Trial Bf.  at 13.) (This perceived risk is attributed to Defendants's objection to the search, claims that she was being physically hurt, demands that it stop, and at least implicit, if not explicit, cries for

help. There is no evidence that Defendant's specifically asked or directed others to interfere or attack the rangers.)

The relevant disorderly conduct subsection states:

(a) A person commits disorderly conduct when, with intent to cause public alarm, nuisance, jeopardy or violence, or knowingly or recklessly creating a risk thereof, such person commits any of the following prohibited acts:

(2) Uses language, an utterance, or gesture, or engages in a display or act that is obscene, physically threatening or menacing, or done in a manner that is likely to inflict injury or incite an immediate breach of the peace.

36 C.F.R. § 2.34(a)(2)

In <u>United States v. Poocha</u>, 259 F.3d 1077, 1080 (9th Cir. 2001), the Ninth Circuit determined that 36 C.F.R. § 2.34(a)(2) does not impermissibly criminalize speech protected by the First Amendment to the United States Constitution because the statute:

closely tracks, in part, the words of the historic Supreme Court decision in <u>Chaplinsky v. New Hampshire</u>, 315 U.S. 568, 572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942), in which the Court described the type of language that may be legally proscribed by the government -- specifically classes of speech "which by their very utterance inflict injury or tend to incite an immediate breach of the peace." The one federal decision construing § 2.34(a)(2) that we found notes that "the statute is designed to prohibit speech that incites violence, or 'presents a clear and present danger' . . . "[t]his statute covers what are known as 'fighting words' and 'incitement to riot.'" <u>United States v. Chung Lee</u>, 1991 U.S. Dist. LEXIS 13265, 1991 WL 193422, at *2 (E.D. Pa. Sept. 20, 1991). Because the regulation proscribes only that speech that stands beyond the constitutional bourn, Poocha's appeal requires us to determine whether the speech of which he was convicted falls within the parameters of the First Amendment, or whether it does not and it is covered by the regulation.

<u>Poocha</u>, 259 F.3d at 1080. Accordingly, this Court must consider "whether the speech of which [Defendant] was [charged] falls within the parameters of the First Amendment, or whether it does not and it is covered by the regulation." <u>Poocha</u>, 259 F.3d at 1080.

Defendant argues that her statements did not fall into the category of "fighting

-24-

words." "To characterize speech as actionable 'fighting words,' the government must prove that there existed 'a likelihood that the person addressed would make an immediate violent response.'" Poocha, 259 F.3d at 1080-81 (quoting Gooding v. Wilson, 405 U.S. 518, 528, 92 S. Ct. 1103, 31 L. Ed. 2d 408 (1972)). Here, two factors leave the Court unable to find sufficient evidence of such a likelihood.  First, courts apply a "narrower application" to the fighting words exception when the person addressed is a law enforcement official, "because a properly trained officer may reasonably be expected to exercise a higher degree of restraint than the average citizen and thus be less likely to respond belligerently to fighting words," and is "compelled by the constitutional shield that protects criticism of official conduct." Poocha, 259 F.3d at 1081 (quotations and citations omitted). It was not reasonably foreseeable that Defendants statement would incite the rangers.

Second, even if Defendant's statements were directed to the public at large, including fellow campers, nothing other than the circumstances generally has been presented as evidence that the speech was intended or likely to incite the onlookers at the scene to riot. See Brandenburg v. Ohio, 395 U.S. 444, 447, 23 L. Ed. 2d 430, 89 S. Ct. 1827 (1969). Here, Defendant's statements were clearly made to draw attention to the situation at hand. They *may* very well have been, not sincere and spontaneous, but rather coldly calculated by Defendant to raise righteous indignation with the rangers' actions. They *may* have been designed to cause bystanders to question and even challenge the rangers' conduct.  Those are possibilities that the Court does not rule out.   However, there is no evidence that would enable this Court to find *beyond a reasonable doubt* and in accord with controlling Ninth Circuit authority that Defendant's statements were intended or likely to incite other campers to riot and violently attack the rangers or done in reckless

disregard of such possibility. In similar circumstances in <u>Poocha</u>, the Ninth Circuit found that it was "not even a close" question that statements made in the midst of an already emotional crowd criticizing the conduct of Yosemite rangers did not constitute an incitement to riot. <u>Poocha</u>, 259 F.3d at 1082.[11] In Defendant's case, there were few onlookers, no evidence that they were emotional, and no evidence that Defendant's statements requested that they take violent action against the officers. Under these circumstances, the Court has no option but to find Defendant's statements to have been constitutionally protected speech and not a lawful basis for a conviction under § 2.34(a)(2) for using language "in a manner that is likely to inflict injury or incite an immediate breach of the peace."

2.     Unreasonable Noise

Defendant was also charged with making unreasonable noise. The relevant subsection states:

> (a) A person commits disorderly conduct when, with intent to cause public alarm, nuisance, jeopardy or violence, or knowingly or recklessly creating a risk thereof, such person commits any of the following prohibited acts:
>
> (3) Makes noise that is unreasonable, considering the nature and purpose of the actor's conduct, location, time of day or night, and other factors that would govern the conduct of a reasonably prudent person under the circumstances.

36 C.F.R. § 2.32(a)(3).

The briefing of neither party identifies the particular conduct giving rise to alleged violation of this regulation. The Court will assume the charge is leveled at Defendant's

---

[11] In another more recent case originating from Yosemite National Park, a conviction for disorderly conduct was overturned as violative of First Amendment protections. See <u>United States v. Schaffer</u>, 2010 U.S. Dist. LEXIS 11940, 20-26 (E.D. Cal. Jan. 29, 2010). Inasmuch as relevant First Amendment jurisprudence has remained static, continued prosecutions of such charges seems questionable.

-26-

conduct during and following the search incident to arrest in which Defendant continuously screamed in protest.

The subsection appears to be a facially valid, content-neutral, time, place, and manner restriction. See Rosenbaum v. City & County of San Francisco, 484 F.3d 1142, 1158 (9th Cir. 2007). Defendant has not challenged its constitutional validity nor suggested that the Court should refuse to apply it to the facts of the case at hand.

With regard to location and time of day, one reasonably would expect relatively loud noise in a campsite during the day from, for example, music, singing, game playing, generators, etc. See e.g., 36 C.F.R. §§ 2.10, 2.12 (noise up to 60 decibels is acceptable, unless during quiet hours from 10:00 p.m. to 6:00 a.m.). There is nothing about the location or time of day that would create a need for heightened restriction of noise.

It is significant here that noise was made at a time when Defendant was being subjected to an unlawful arrest. Also, as noted, Defendant testified to a not insignificant history of abuse and reacted to what she perceived as a sexual assault by a federal law enforcement agent. (RT 118-19.) It is difficult to determine how a reasonable person should react to such circumstances; screaming may well have been an appropriate response. On the other hand, the Court cannot rule out the possibility that the screams were designed solely to disrupt and/or discourage the search. The fact they continued long after the search ended is at least an indication of such a calculated objective. However, that *possibility* is insufficient to support a finding of guilt. Considering all of the circumstances, the Court cannot find *beyond a reasonable doubt* that Defendant's verbal response to the search was unreasonable or unlawful.

However, Defendant continues what might be described as blood-curdling screams

for a significant period of time long after the search was completed. The screams continued at a time when she was isolated in a vehicle and no longer suffering the assault which initiated her vocal reaction.  While the Court gives Defendant the benefit of the doubt in finding her initial reaction to have been spontaneous and perhaps irrepressible for her and not violative of the law, it cannot do the same to the continuation of the screaming. The circumstances and the audio recording convince the Court that the continued screaming had, and served, no purpose other than intentionally to disrupt.  It was loud enough even from inside the Ranger's vehicle to accomplish such disruption and violate the regulation. Defendant is guilty of having violated 36 C.F.R. § 2.34(a)(3).

### E.    Resisting an Illegal Arrest

Upon being placed under arrest Defendant, resists the attempts of the rangers to conduct a search incident to her arrest. During the search, Defendant yells for the rangers to stop, physically contorts and writhes to interfere with the search, and falls to the ground in the process. Ranger Bellino testified that Defendant also kicked him in the leg during the search.

Defendant contends that she had a right  reasonably to resist this, an illegal, arrest.

The right to resist an illegal arrest existed at common law and was considered well-established by the Supreme Court. See Bad Elk v. United States, 177 U.S. 529, 537 (1900); United States v. Di Re, 332 U.S. 581, 594-595 (1948). "One has an undoubted right to resist an unlawful arrest, and courts will uphold the right of resistance in proper cases," Di Re, 332 U.S. at 594-595. The Supreme Court has yet to abrogate the common law doctrine of resistance to an illegal arrest approved in Bad Elk and Di Re. As late as 1968, one Supreme Court justice, in dissenting to the dismissal of the writ of certiorari,

referred to the common law right as still viable:

> Under our authorities (cf. Elk v. United States, 177 U.S. 529, 534-535; and see United States v. Di Re, 332 U.S. 581, 594), at least prior to the ill-starred case of Terry v. Ohio, a citizen had the right to offer some resistance to an unconstitutional "seizure" or "search." Must he now stand quietly and supinely while officers "pat him down," whirl him around, and throw him in the wagon?
>
> The present episode may be an insignificant one and the hurt to petitioner nominal. But the principle that a citizen can defy an unconstitutional act is deep in our system. Thomas v. Collins, 323 U.S. 516, 532-537.
>
> When in a recent case (Wright v. Georgia, 373 U.S. 284, 291-292), it was said that "failure to obey the command of a police officer constitutes a traditional form of breach of the peace," we made a qualification: "Obviously, however, one cannot be punished for failing to obey the command of an officer if that command is itself violative of the Constitution."

Wainwright v. New Orleans, 392 U.S. 598, 613-614 (1968) (Douglass, J., dissenting).

The Ninth Circuit recognized such a right in Bergstralh v. Lowe, 504 F.2d 1276, 1278 (9th Cir. 1974) ("Bergstralh was entitled to use all force reasonably necessary to resist an unlawful arrest. Thus, in order to conclude that Bergstralh was guilty of resisting arrest, the jury would have had to have concluded that his arrest was legal.") (citations omitted). In United States v. Moore, the Ninth Circuit assumed that the right remained valid and was available as a defense to a prosecution under 18 U.S.C. § 111.[12] 483 F.2d 1361, 1364 (9th Cir. 1973). However, the Ninth Circuit found the right to resist inapplicable in Moore because there the arrest was only unlawful in the "derivative" sense of a technically improper search and the defendant was found guilty of possession of marijuana despite the illegal search. Id. (Here, Defendant's arrest was not unlawful in a derivative sense. She

---

[12] 36 C.F.R. § 2.32(a)(1) codified many of the elements in § 111 regarding assaulting or resisting a federal officer. It is assumed that the right to resist would likewise act as a defense to § 2.32(a)(1).

had not engaged in criminal activity prior to her engagement with the rangers. As such,

Moore is inapposite.)

In United States v. Span, the Ninth Circuit tempered its approach to the right to

resist an illegal arrest. 970 F.2d 573, 579-580 (9th Cir. 1992). There the Ninth Circuit

concluded that identification of a right to resist an arrest unsupported by probable cause

was only dictum and a very controversial proposition given the dearth of contemporary

authority supporting such a right. Id.  (Span does not however address the Supreme

Court's seemingly direct authority in Bad Elk and Di Re.)

In Span, the Ninth Circuit reacted to the fact that many states had abrogated the

right to resist so as to discourage  violence and encourage resolution of disputes within

appropriate legal frameworks. The Eighth Circuit described the state of the law as follows:

> At common law, a person was permitted to forcibly resist an unlawful
> arrest, and third parties were permitted to aid such resistance. See John Bad
> Elk v. United States, 177 U.S. 529, 534-37, 44 L. Ed. 874, 20 S. Ct. 729
> (1900); West v. Cabell, 153 U.S. 78, 86, 38 L. Ed. 643, 14 S. Ct. 752 (1894).
> However, in Hodgdon v. United States, we indicated--albeit in dicta--that the
> common law rule was no longer good law: "No person should be entitled to
> resist with deadly force a marshal operating under color of authority, even
> though it is later found that no actual authority existed. Adequate legal
> protection exists against unlawful searches and arrests." 365 F.2d 679, 685
> (8th Cir. 1966) (citations omitted). This statement is consistent with the
> widespread criticism of the rule and the trend toward its abrogation. See
> United States v. Johnson, 542 F.2d 230, 232-33 (5th Cir. 1976) ("We do not
> need citizen avengers who are authorized to respond to unlawful police
> conduct by gunning down the offending officers."); see generally State v.
> Hobson, 218 Wis. 2d 350, 577 N.W.2d 825, 834 (Wis. 1998) (noting trend
> toward abrogation and rule's elimination from Model Penal Code); Andrew
> P. Wright, Resisting Unlawful Arrests: Inviting Anarchy or Protecting
> Individual Freedom?, 46 Drake L. Rev. 383, 388 n.49 (1997) (noting thirty-six
> states in which right to resist unlawful arrest has been eliminated).

Von Kahl v. United States, 242 F.3d 783, 790 (8th Cir. N.D. 2001)

Still, strong dissents have identified compelling rationales for continuing the

-30-

doctrine.  For example, in a concurring opinion to the Wisconsin Supreme Court's decision

abrogating the right in that state, Chief Justice Abrahamson criticizes the majority for failing

to address countervailing interests in maintaining the common law right. State v. Hobson,

577 N.W.2d 825 (Wis. 1998). Justice Abrahamson mentions that the right protects those

provoked into resistance from an arbitrary use of police power:

> In choosing to abrogate the common law right to resist an unlawful arrest for reasons of public policy, the majority ignores the rationale behind the right. The common law right to resist an unlawful arrest was not designed to foster resistance to law enforcement officers or to encourage people to disobey them. Instead the common law right to resist unlawful arrest was designed to protect a person provoked by a wrongful arrest from being criminally charged with obstructing an officer. Professor Chevigny, a commentator upon whom the majority relies, explains that it is fundamentally unfair to punish a person who has been unlawfully arrested for expressing his or her deep emotion with measured resistance:
>
>> The right does not exist to encourage citizens to resist, but rather to protect those provoked into resistance by unlawful arrests. In the excitement of an arrest, a person is likely to respond to his emotions, and if his impulse to resist is provoked by arbitrary police behavior, it is fundamentally unfair to punish him for giving in to that impulse with measured resistance.
>
> Paul G. Chevigny, The Right to Resist Arrest, 78 Yale L.J. 1128, 1133-34 (1969).

Hobson, 577 N.W.2d at 840 (Abrahamson, C.J., concurring). Further, she mentions that

the remedies available to address an illegal arrest after the fact may not be sufficient:

> Furthermore, the remedies at law are not effective in this situation. The majority opinion explains that unlawfully arrested persons should go down to the police station, secure their freedom by making bail and later bring a civil rights action against the police. In adopting this reasoning, the majority opinion treats the experience of undergoing arrest, fingerprinting, photographing, interrogation, detention and trying to make bail as minor deviations from a person's daily routine.
>
> Unfortunately the legal system does not always work so smoothly. The right

-31-

to counsel, although constitutionally guaranteed, is unfortunately not
available to those not poor enough to qualify for a public defender but too
poor to hire their own private counsel. The majority opinion's reliance on civil
damages actions is similarly problematic. Although a civil rights action under
42 U.S.C. § 1983 is in theory available for victims of unlawful arrest, in
practice such relief is contingent on the availability and willingness of
attorneys to bring such actions. Attorneys are hesitant to accept such cases
when monetary damages are insignificant or difficult to prove. Likewise
internal review and disciplinary procedures in police departments do not
provide an adequate remedy for victims of unlawful arrest.

Thus, contrary to the reasoning of the majority opinion, the various
procedural safeguards in the criminal justice system often fail to provide
adequate redress for victims of unlawful arrest. In evaluating the legal
remedies afforded to victims of unlawful arrest, this court should not wear
blinders to what happens in real life or discount the indignity of being
subjected to unlawful arrest, the potential physical harm of being
incarcerated, and the negative consequences to reputation and employment.

Id. at 841.

This Court need not, and shall not, make a determination as to whether the federal

right to resist an unlawful arrest has been so definitively abrogated or curtailed as to

prevent its use defensively here. Perhaps higher federal courts or Congress will assess the

competing  interests and come to a reasoned policy.

Until that time, the right to resist remains, at least in some capacity. As the Supreme

Court described in Bad Elk, only reasonable resistance or "such force as was absolutely

necessary" may be used by a defendant in resisting arrest. Bad Elk, 177 U.S. at 537.

Defendant in this case squirmed, screamed, and otherwise physically attempted to move

her body to prevent what she testified under oath was seen as sexually volatile conduct on

the part of the rangers during what she also correctly perceived to be an illegal arrest.

Under whatever vestige of the right to resistance to an unlawful arrest remains, the Court

finds Defendant's conduct defensible. Also, as noted above, there is evidence that

Defendant was reacting spontaneously, perhaps reflexively, to what she perceived as a

-32-

repeat of earlier sexual assaults on her.  While the Court cannot but view such claims with a bit of skepticism, it is unable to find *beyond a reasonable doubt* that Defendant had the mental sate to commit and did commit the crime of resisting arrest. See United States v. Bibbins, 637 F.3d 1087, 1091-93 (9th Cir. 2011).

Defendant is not guilty of resisting arrest.

**VII.    FINDINGS AND CONCLUSIONS**

For the reasons and based upon the evidence described above the Court finds that on July 26, 2011, in Yosemite National Park, Defendant did make unreasonable noise under 36 C.F.R. 2.34(a)(3) as charged in Count 4 of the Criminal Complaint.

Accordingly, the Court finds Defendant GUILTY of violating 36 C.F.R. § 2.34(a)(3) as charged in the Criminal Complaint. All other charges are hereby DISMISSED.

Sentencing shall take place at 10:00 a.m. on June 5,  2012, in the Courtroom of the undersigned in Yosemite National Park.


IT IS SO ORDERED.

Dated:    May 17, 2012            /s/ *Michael J. Seng*

UNITED STATES MAGISTRATE JUDGE

-33-